UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-----------------------------------------------------x

UNITED STATES OF AMERICA *ex rel.*
YVONNE WARD,

Plaintiff,

**MEMORANDUM & ORDER**
22-CV-4725 (PKC) (MMH)

- against -

FEGS HOME ATTENDANT SERVICES INC., *et al.*,

Defendants.

-----------------------------------------------------x

PAMELA K. CHEN, United States District Judge:

This is a whistleblower case alleging fraud related to the federal government's Paycheck Protection Program ("PPP"). (*See generally* Am. Compl., Dkt. 43.) The whistleblower, relator Yvonne Ward ("Relator"), is a compliance consultant in the home health care industry, and she brings this *qui tam* lawsuit on behalf of the United States under the False Claims Act ("FCA"). (*See id.* ¶¶ 55–56.)[1] Named as Defendants are three affiliated home health care agencies: FEGS Home Attendant Services Inc. ("FEGS"), Home Attendant Service of Hyde Park, Inc. ("Home Attendant"), and Home Health Management Services, Inc. ("Home Health"). (*Id.* ¶¶ 57–59.) Relator claims that Defendants wrongfully obtained over $21 million from the United States through fraudulent PPP loans. (*See id.* ¶¶ 46–49.)

Defendants move to dismiss the Amended Complaint in its entirety for failure to state a claim pursuant to Federal Rule of Civil Procedure ("Rule") 12(b)(6), and for failure to allege fraud with sufficient particularity pursuant to Rule 9(b). (Defs.' Mot. to Dismiss, Dkt. 49; Defs.'

[1] The FCA "creates a right of action under which private parties may, on behalf of the federal government, bring lawsuits alleging fraud. The actions go by the hoary Latin term '*qui tam*' . . . . The party seeking to represent the government's interest is called a 'relator.'" *United States ex rel. Foreman v. AECOM*, 19 F.4th 85, 101 n.6 (2d Cir. 2021) (citations omitted).

Mem. Supp. Mot. to Dismiss ("Mem."), Dkt. 49-1.)[2] For the reasons discussed below, Defendants' motion is denied.

## BACKGROUND

### I. Factual Allegations

The following allegations are taken from the Amended Complaint and, unless stated otherwise, they are presumed to be true for the purposes of this Memorandum & Order. *See United States ex rel. Kirk v. Schindler Elevator Corp.* (*Kirk I*), 601 F.3d 94, 100 (2d Cir. 2010) (explaining that on a motion to dismiss pursuant to Rule 12(b)(6), the court "accept[s] as true the material facts alleged in the complaint" (citations omitted)), *rev'd on other grounds by Schindler Elevator Corp. v. United States ex rel. Kirk* (*Kirk II*), 563 U.S. 401 (2011).

#### A. The Paycheck Protection Program

Congress enacted the PPP in March 2020 as part of the Coronavirus Aid, Relief, and Economic Security ("CARES") Act. (Am. Compl., Dkt. 43, ¶ 77); CARES Act, Pub. L. No. 116-136, 134 Stat. 281 (2020). The PPP was intended to "provide economic relief to small businesses nationwide" that were "adversely impacted" by the economic fallout from the COVID-19 pandemic. (Am. Compl., Dkt. 43, ¶ 78 (quoting Business Loan Program Temporary Changes; Paycheck Protection Program, 85 Fed. Reg. 20,811, 20,811 (Apr. 15, 2020) (to be codified at 13 C.F.R. pt. 120)).) The PPP created a $349 billion fund to be disbursed as potentially-forgivable loans to eligible small businesses and nonprofits through the Small Business Administration ("SBA"). (*Id.* ¶ 77.) That amount was fully disbursed within 13 days.

[2] Though nominally separate entities, Defendants "were effectively run as one operation," (Am. Compl., Dkt. 43, ¶ 7), are represented by the same counsel in this matter, and have filed a single, combined motion to dismiss.

(*Id.* ¶ 93 (citation omitted).) Soon after, Congress added an additional $310 billion to the fund. (*Id.*)

There are two relevant requirements that a business had to satisfy to be eligible for a PPP loan. First, PPP loan borrowers could not employ more than 500 employees. (*Id.* ¶¶ 6–7, 94, 97.)[3] That size limit included all individuals "employed on a full-time, part-time, or other basis," including those employed by all of a borrower's affiliates. (*Id.* ¶ 20 (quoting 15 U.S.C. § 636(a)(36)(D)(v)); *id.* ¶ 102.) Second, PPP loan borrowers needed to certify that the loan was necessary for their ongoing operations. (*Id.* ¶ 117 (citing 15 U.S.C. § 636(a)(36)(G)).) In order for PPP loans to be disbursed expeditiously, however, borrowers were not extensively screened or scrutinized for their eligibility. (*Id.* ¶¶ 85–89.) Instead, the program relied heavily on borrowers to self-certify that they were eligible for the loans. (*Id.*)

PPP loans could only be used during a specified "Covered Period"[4] and only for specified expenses, such as payroll costs, rent, and utilities. (*Id.* ¶ 80 (first citing 15 U.S.C. § 636(a)(36)(F); and then citing Business Loan Program Temporary Changes, 85 Fed. Reg. at 20,814).) The loans were capped at two-and-a-half times the borrower's average monthly payroll expenses incurred during 2019, and no more than $10 million. (*Id.* ¶ 79 (first citing 15

[3] The calculation of a borrower's number of employees was based on an average from either the employer's data for the year 2019 or, alternatively, the twelve calendar months preceding the employer's PPP loan application. (Am. Compl., Dkt. 43, ¶¶ 19, 94.) There was an exception to the size requirement for private companies that qualified as a "small business concern" under 15 U.S.C. § 632, but that exception did not apply to Defendants because they, as nonprofits, could not qualify as "small business concerns." (*Id.* ¶¶ 95–96.) On March 11, 2021, the American Rescue Plan Act, Pub. L. No. 117-2, 135 Stat. 4 (2021), expanded the size limit to 500 employees per physical location (including affiliates) rather than in total. (*Id.* ¶ 8.)

[4] The Covered Period was originally eight weeks, which was extended to 24 weeks in June 2020 by the Paycheck Protection Program Flexibility Act. (Am. Compl., Dkt. 43, ¶ 80 (first citing 15 U.S.C. § 636(a)(36)(F); and then citing Business Loan Program Temporary Changes, 85 Fed. Reg. at 20,814)); *see also* Paycheck Protection Program Flexibility Act, Pub. L. No. 116-142, § 3, 134 Stat. 641, 641 (2020).

U.S.C. § 636(a)(36)(E)(i)(I)(aa); and then citing Business Loan Program Temporary Changes, 85 Fed. Reg. at 20,812–13).)

After the end of the Covered Period, borrowers could submit a request to the SBA through their lenders to have their PPP loans forgiven. (*Id.* ¶ 81 (citing 15 U.S.C. § 636(a)(36)).) The loans could be forgiven in full, including the entire principal of the loan plus any accrued interest, but the forgiveness amount would be reduced if the borrower failed to comply with certain restrictions. (*Id.* ¶¶ 81–84.) For example, the forgiveness amount would be reduced if the borrower had spent less than 60% of the loan funds on payroll expenses (as opposed to other eligible expenses such as rent), or if the borrower reduced the number of its employees or the wages paid to them during the Covered Period. (*Id.* ¶¶ 83–84); 15 U.S.C. § 636m(d)(2)–(3). As with the application process, the loan forgiveness process relied on borrowers to self-certify that they had used the funds for eligible expenses. (Am. Compl., Dkt. 43, ¶¶ 90–91 (citations omitted).)

**B. Relator's Work with Defendants and Defendants' PPP Loan Applications**

Relator Yvonne Ward is a compliance consultant in the home health care industry. (*Id.* ¶ 56.) At the time Relator filed the complaint in this matter in August 2022, she had worked in that field for the past 15 years. (*Id.*) In early 2021, Relator began working on several projects for Defendant FEGS and its controlling members, Mendel Kaff and Samuel Kornitzer. (*Id.* ¶ 67.) Through Relator's work, "she learned that FEGS, Home Health, and Home Attendant were all effectively run as one operation." (*Id.*) She also learned details about Defendants' businesses, including staffing and payroll practices. (*Id.* ¶¶ 67–76.) Finally, she learned that all three Defendants had received PPP loans the previous year, on April 27 and28, 2020. (*Id.* ¶¶ 71, 128 (citation omitted).) Defendant FEGS received a loan for $9,283,222, Defendant Home Attendant received a loan for $6,144,718, and Defendant Home Health received a loan for

$5,918,305. (*Id.* ¶¶ 15–17.) Relator observed that these loans were "very sizable" and "appeared to be based on [the payroll expenses for] all of the Defendants' employees." (*Id.* ¶ 71.)

Relator believed that Defendants were ineligible for the PPP loans they had received. She states that "each of the Defendants possessed far more than the maximum number of employees permissible to obtain a PPP loan." (*Id.*) She also states that she did not believe that Defendants had truthfully certified that they needed the loans for their ongoing operations. (*Id.* ¶ 73.) That belief was based in part on Defendants' funding and payment structure, which she was familiar with due to her work for FEGS. (*Id.*) She explains that, as with other home care agencies for which she had consulted, Defendants had a "relatively small group of administrative staff, but most of their employees [were] caregivers (aides who provide the in-home services) that [were] paid hourly upon the provision of services to a Medicaid beneficiary." (*Id.* ¶ 64; *see also id.* ¶¶ 71, 73–74.) Relator's understanding was that Defendants received full reimbursement for those workers' services from public funding such as Medicaid. (*See id.* ¶¶ 65, 74.) In effect, she believed that Defendants could not have needed PPP loan funds to cover those workers' payroll expenses because Defendants themselves did not pay those expenses: they were fully reimbursed. (*See id.* ¶ 73.)

In 2020 and 2021, Defendants applied for full loan forgiveness from the SBA through their lenders. (*Id.* ¶ 42.) Around the summer of 2021, the SBA fully forgave Defendants' loans. (*See id.* ¶¶ 46–48.) Relator believed that Defendants were ineligible for full loan forgiveness and therefore must have falsely certified their eligibility in order to obtain it. (*See id.* ¶¶ 43–44.) Specifically, Relator believed that Defendants could not have spent 60% of their loan funds on eligible payroll expenses, as required for full reimbursement, because a large majority of their

employees' wages were ineligible. (*See id.* ¶¶ 43–45, 75, 83, 91, 152.) She believed that it was unlawful "double dipping" for Defendants to receive funds to cover the payroll expenses for direct care workers whose payroll expenses had already been covered by funding sources like Medicaid. (*See id.* ¶¶ 65, 132–35, 151.) She also believed that most of Defendants' payroll expenses for their direct care workers were subject to New York's Home Care Worker Wage Parity Law (the "Wage Parity Law"), which set a minimum wage for home care workers who serve Medicaid patients in certain counties. (*See id.* ¶¶ 75, 136–38.) After Congress enacted the PPP, New York amended the Wage Parity Law to specify that home health care agencies, like Defendants, were prohibited from receiving a "refund" or "return[]" of any amount of money they spent on wages to satisfy the Wage Parity Law. (*See id.* ¶¶ 140–42 (citing N.Y. Pub. Health Law § 3614-c).) Relator therefore believed that the majority of Defendants' payroll expenses were ineligible for reimbursement under the PPP. (*See id.* ¶¶ 75, 136–52.)

## II. Procedural History

Relator filed this lawsuit on August 8, 2022. (Compl., Dkt. 1.) The case was initially filed under seal, as required by the FCA. *See* 31 U.S.C. § 3730(b)(2). On February 7, 2024, after investigating Relator's allegations, the United States elected not to intervene in the case. (*See* Notice of Election to Decline Intervention, Dkt. 12.) The Court then unsealed the case. (Order to Unseal, Dkt. 13.) Defendants filed their answer on September 6, 2024. (Answer, Dkt. 26.) Discovery and settlement discussions followed. (*See, e.g.*, Relator's Status Report, Dkt. 38.)

On March 18, 2025, Defendants requested a pre-motion conference ("PMC") regarding their anticipated motion for judgment on the pleadings pursuant to Rule 12(c). (PMC Req., Dkt. 39.) The Court held a PMC on May 14, 2025. (5/14/2025 Min. Entry.) At the PMC, Relator indicated an intention to file an amended complaint, which she ultimately filed on June

9, 2025, (Dkt. 42); Relator filed a corrected version of the same on June 27, 2025, (Am. Compl., Dkt. 43). Relator's Amended Complaint brings three causes of action under the FCA:

- Count One: "knowingly present[ing], or caus[ing] to be presented, a false or fraudulent claim for payment or approval," 31 U.S.C. § 3729(a)(1)(A);
- Count Two: "knowingly mak[ing], us[ing], or caus[ing] to be made or used, a false record or statement material to a false or fraudulent claim," 31 U.S.C. § 3729(a)(1)(B); and
- Count Three: "knowingly mak[ing], us[ing], or caus[ing] to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceal[ing] or knowingly and improperly avoid[ing] or decreas[ing] an obligation to pay or transmit money or property to the Government," 31 U.S.C. § 3729(a)(1)(G).

(*See* Am. Compl., Dkt. 43, ¶¶ 158–72.) Relator seeks treble damages, a civil penalty, and awards of costs, expenses, and attorney's fees. (*Id.* at 31.)

On August 18, 2025, Defendants served Relator with the instant motion to dismiss the Amended Complaint pursuant to Rules 12(b)(6) and 9(b). (Defs.' Mot. to Dismiss, Dkt. 49; Defs.' Letter, Dkt. 46.)[5] Relator served her opposition to the motion on September 17, 2025. (Pl.'s Opp'n to Mot. to Dismiss ("Opp'n"), Dkt. 51.) Defendants served their reply on October 6, 2025. (Defs.' Reply Supp. Mot. to Dismiss ("Reply"), Dkt. 50.) The motion is now fully briefed.

---

[5] Though Defendants' PMC request indicated that they were going to file a motion for judgment on the pleadings under Rule 12(c), they ultimately filed the instant motion to dismiss under Rules 12(b)(6) and 9(b). After Defendants filed their PMC request, Relator filed her Amended Complaint, thereby reopening the period in which Defendants could file a Rule 12(b)(6) motion.

## LEGAL STANDARD

### I. Rule 12(b)(6)

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing same at 556). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting same). Determining whether a complaint states a plausible claim for relief is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679 (citation omitted).

In reviewing a complaint for failure to state a claim, the Court accepts the well-pleaded factual allegations in the complaint as true and draws all reasonable inferences in the plaintiff's favor. *See Concord Assocs., L.P. v. Ent. Props. Tr.*, 817 F.3d 46, 52 (2d Cir. 2016) (citing *Chambers v. Time Warner Inc.*, 282 F.3d 147, 152 (2d Cir. 2002)); *Kirk I*, 601 F.3d at 100 (first citing *Sharkey v. Quarantillo*, 541 F.3d 75, 83 (2d Cir. 2008); and then citing *Freedom Holdings, Inc. v. Spitzer*, 363 F.3d 149, 151 (2d Cir. 2004)).

### II. Rule 9(b)

"*Qui tam* complaints filed under the FCA, because they are claims of fraud, are subject to Rule 9(b)." *United States ex rel. Chorches v. Am. Med. Response*, 865 F.3d 71, 81 (2d Cir. 2017) (first citing *United States ex rel. Ladas v. Exelis, Inc.*, 824 F.3d 16, 26 (2d Cir. 2016); and then citing *Gold v. Morrison-Knudsen Co.*, 68 F.3d 1475, 1476–77 (2d Cir. 1995)). "Rule 9(b) states that 'in alleging fraud, a party must state with particularity the circumstances constituting

fraud.'" *Id.* (citation modified) (quoting Fed. R. Civ. P. 9(b)). To satisfy this heightened pleading standard, a complaint ordinarily must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Id.* (quoting *Ladas*, 824 F.3d at 25).

## DISCUSSION

### I. The False Claims Act's Public Disclosure Bar and Original Source Exception

Defendants first argue that the Amended Complaint should be dismissed under Rule 12(b)(6) based on the FCA's "public disclosure bar." (Mem., Dkt. 49-1, at 6–12.) The Court disagrees.[6]

[6] As an initial matter, Relator argues that Defendants "previously waived any argument they may have had under the public disclosure bar" by "fail[ing] to assert the public disclosure bar as an affirmative defense" in their answer to Relator's original complaint, (*see* Answer, Dkt. 26). (Opp'n, Dkt. 51, at 7.) The Court is not persuaded. First, because Relator amended her complaint, Defendants' answer to the original complaint is no longer operative and Defendants' "right to interpose a Rule 12(b) motion is . . . revived accordingly." *See* 5C *Wright & Miller's Federal Practice & Procedure* § 1361 (3d ed. Apr. 2026). Second, Defendants did include the affirmative defense that "[Relator] fails to state a claim upon which relief may be granted against Defendants" in their answer to the original complaint. (*See* Answer, Dkt. 26, at 18.) The public disclosure bar argument falls within that defense. *See New York ex rel. Khurana v. Spherion Corp.*, No. 15-CV-6605 (JFK), 2016 WL 6652735, at *11 (S.D.N.Y. Nov. 10, 2016) (explaining that the post-2010 public disclosure bar "goes to whether a plaintiff has stated a claim" (collecting cases)). Third, even if Relator had *not* filed an amended complaint, and even if Defendants had *not* asserted failure to state a claim as a defense in their answer, Defendants could still raise that defense for the first time in a Rule 12(c) motion or even at trial. *Contrast* Fed. R. Civ. P. 12(h)(2) (allowing a party to raise a defense based on failure to state a claim "in any pleading," "by a motion under Rule 12(c)," or "at trial"), *with id.* R. 12(h)(1) (specifying that defenses for lack of personal jurisdiction, improper venue, insufficient process, or insufficient service of process are waived if not made in a responsive pleading or a motion under Rule 12); *cf. Gilmore v. Shearson/Am. Exp. Inc.*, 811 F.2d 108, 112 (2d Cir. 1987) (explaining that "the Rule 12 defenses of lack of personal jurisdiction, improper venue, insufficiency of process and insufficiency of service" are "waived by defendant's failure to raise those objections in response to the original complaint," and "may not be resurrected merely because a plaintiff has amended the complaint" (citations omitted)). Thus, "even if [Defendants'] answer to the original complaint bars [them] from filing a motion to dismiss [the amended complaint] for failure to state a claim under Rule 12(b)(6)"—which is not at all clear—the Court could still "consider the motion under Rule 12(c)," which involves the same standard of review. *See Kalin v. Xanboo, Inc.*, 526 F. Supp. 2d 392, 398 (S.D.N.Y. 2007). In any event, the Court rejects Defendants'

To address the problem of fraudulent billings against the federal government, the FCA's *qui tam* provision "encourage[s] suits by private citizens who learn of fraud against the government," and those private citizens/relators are "entitled to a portion of the proceeds of successful suits." *United States ex rel. Doe v. John Doe Corp.*, 960 F.2d 318, 319 (2d Cir. 1992). But because of the financial incentive for relators, "there is the potential for parasitic lawsuits by those who learn of the fraud through public channels and seek remuneration although they contributed nothing to the exposure of the fraud." *Id.* The public disclosure bar seeks to preclude such "parasitic lawsuits" by preventing claims based on allegations or transactions that are "substantially the same" as others that have already been publicly disclosed through one of the sources enumerated in the FCA. *See* 31 U.S.C. § 3730(e)(4)(A).

However, there is an exception to the public disclosure bar. Even if a relator's claims are substantially the same as allegations that have already been publicly disclosed, their claims are not barred if the relator is an "original source" of the information. *See id.* § 3730(e)(4)(A)–(B).[7] The "original source" exception reflects the goal of the FCA's public disclosure bar, which is to "strike a balance" by preventing parasitic actions while still "encouraging private citizens to expose fraud." *United States ex rel. Foreman v. AECOM*, 19 F.4th 85, 123 (2d Cir. 2021) (quoting *Doe*, 960 F.2d at 321); *see also Graham Cnty. Soil & Water Conservation Dist. v.*

---

public disclosure bar argument on the merits, so this discussion is largely academic.

[7] Defendants suggest that the public disclosure bar requires relators to demonstrate *both* that their allegations "were not based in any part upon publicly disclosed information" *and* "that the relator is an 'original source' of the information upon which the claim is based." (Mem., Dkt. 49-1, at 5–6 (citing 31 U.S.C. § 3730(e)(4)).) That is incorrect. Rather, a relator clears the public disclosure bar *either* if their allegations are not substantially the same as what has been publicly disclosed *or* if the relator was an original source of the publicly disclosed information. *See* 31 U.S.C. § 3730(e)(4)(A) ("The court shall dismiss an action or claim under this section . . . if substantially the same allegations . . . were publicly disclosed . . . *unless* . . . the person bringing the action is an original source of the information." (emphasis added)).

*United States ex rel. Wilson*, 559 U.S. 280, 301 (2010) (observing that "Congress carefully preserved the rights of the most deserving *qui tam* plaintiffs: those whistle-blowers who qualify as original sources"); *Chorches*, 865 F.3d at 80 n.5 ("The public disclosure bar is intended to confine the right to bring *qui tam* actions to those who bring frauds against the public treasury to the attention of the government and the courts.").

Congress amended the statutory text of the public disclosure bar and original source exception in 2010. *See* Patient Protection and Affordable Care Act, Pub. L. No. 111-148, § 10104(j)(2), 124 Stat. 901 (2010). Importantly, as a result of the amendment, the public disclosure bar is no longer jurisdictional. *See Chorches*, 865 F.3d at 80 (noting that the public disclosure bar "was formerly written as a jurisdictional bar, but was amended in 2010 specifically to *delete* the jurisdictional language"; and "join[ing] the majority of . . . circuits that have addressed the issue in holding that the public disclosure bar is no longer jurisdictional" (collecting cases)). Congress also narrowed the definition of a public disclosure and expanded the original source exception. The pre-amendment statutory language read:

> (A) No court shall have jurisdiction over an action under this section based upon the public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation, or from the news media, unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.
>
> (B) For purposes of this paragraph, "original source" means an individual who has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the Government before filing an action under this section which is based on the information.

31 U.S.C. § 3730(e)(4) (2009) (amended 2010). The post-amendment statutory language reads:

> (A) The court shall dismiss an action or claim under this section, unless opposed by the Government, if substantially the same allegations or transactions as alleged in the action or claim were publicly disclosed--

> (i) in a **Federal** criminal, civil, or administrative hearing **in which the Government or its agent is a party**;
>
> (ii) in a congressional, Government Accountability Office, or other **Federal** report, hearing, audit, or investigation; or
>
> (iii) from the news media,
>
> unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.
>
> (B) For purposes of this paragraph, "original source" means an individual who **either** (i) prior to a public disclosure under [paragraph (A)], has voluntarily disclosed to the Government the information on which allegations or transactions in a claim are based, **or** [(ii)] has knowledge that is independent of **and materially adds to** the publicly disclosed allegations or transactions, and who has voluntarily provided the information to the Government before filing an action under this section.

31 U.S.C. § 3730(e)(4) (emphasis added). To the Court's knowledge, there is no binding precedent from either the Supreme Court[8] or the Second Circuit[9] interpreting the above-highlighted changes.

---

[8] *See Graham Cnty. Soil & Water*, 559 U.S. at 283 n.1 (explaining that the 2010 amendment went into effect after the suit had been filed, the amendments did not apply retroactively to pending cases, and therefore applying the public disclosure bar's pre-amendment language); *Kirk II*, 563 U.S. at 404 n.1 (similar); *State Farm Fire Ins. & Cas. Co. v. United States ex rel. Rigsby*, 580 U.S. 26, 30 (2016) (similar); *see also Kellogg Brown & Root Servs., Inc. v. United States ex rel. Carter*, 575 U.S. 650, 662–64 (2015) (addressing a different provision of the FCA, but not the public disclosure bar or original source exception); *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 579 U.S. 176 (2016) (same); *Cochise Consultancy, Inc. v. United States ex rel. Hunt*, 587 U.S. 262 (2019) (same); *United States ex rel. Polansky v. Exec. Health Res., Inc.*, 599 U.S. 419 (2023) (same).

[9] In *Chorches*, the Second Circuit did not address the amendment further after concluding that the bar is no longer jurisdictional because it held that the defendant's public-disclosure-bar argument had been waived. *See* 865 F.3d at 80 & n.5. In *Foreman*, the Second Circuit applied the post-amendment public disclosure bar, but the issue presented—whether certain disclosures were "public"—was not affected by the amendment, and therefore the Circuit did not have occasion to address the amendment or its effects. *See* 19 F.4th at 122–26 (concluding that disclosures made only to the federal government were not "public disclosures"); *see also* 31 U.S.C. § 3730(e)(4)(A) (2009) (amended 2010) (pre-amendment, still limiting scope of the public disclosure bar to "public disclosure[s]"). The Second Circuit's other published post-amendment FCA decisions similarly have not addressed the effect of the amendment's changes

### A. Whether the Public Disclosure Bar Applies

The Court first considers whether allegations that are substantially the same as Relator's were publicly disclosed in a manner set forth in the FCA. *See Doe*, 960 F.2d at 323; 31 U.S.C. § 3730(e)(4)(A).[10] As the Second Circuit has explained, the public disclosure bar applies "regardless of where the relator obtained [her] information." *Doe*, 960 F.2d at 324 (citations omitted). In other words, at this stage of the analysis, it does not matter whether Relator obtained the information from her own investigation or from the publicly disclosed information. *See id.*

Courts in this Circuit have generally held that public disclosures are substantially the same as a relator's allegations if the public disclosures contain all of the "essential elements" of the alleged fraud. *See United States ex rel. Kirk v. Schindler Elevator Corp.* (*Kirk III*), 437 F. App'x 13, 17 (2d Cir. 2011) (summary order) (holding that the public disclosure bar applied because "information in the public domain[] disclosed all the essential elements of the alleged

---

to the public disclosure bar and original source exception. *See United States ex rel. Hanks v. United States*, 961 F.3d 131, 136 (2d Cir. 2020) (analyzing only pre-amendment public disclosure bar and original source exception); *Miller v. United States ex rel. Miller*, 110 F.4th 533, 537, 540–50 (2d Cir. 2024) (affirming dismissal for failure to state a claim for FCA violation without addressing public disclosure bar or original source exception).

[10] Before the 2010 amendment, the bar applied to allegations "based upon public disclosures"; after 2010, the bar applies to allegations that are "substantially the same" as those publicly disclosed. *See Omni Healthcare, Inc. v. U.S. Oncology, Inc.*, No. 23-1334-CV, 2024 WL 4751635, at *2 n.2 (2d Cir. Nov. 12, 2024) (summary order) (first citing 31 U.S.C. § 3730(e)(4)(A); and then citing 31 U.S.C. § 3730(e)(4)(A) (2000)). This change is likely immaterial because the Second Circuit previously interpreted "based upon" public disclosures to mean "the same allegations as those publicly disclosed." *Id.* (citation modified) (first quoting *Doe*, 960 F.2d at 324; and then citing *United States ex rel. Patriarca v. Siemens Healthcare Diagnostics, Inc.*, 295 F. Supp. 3d 186, 196 (E.D.N.Y. 2018)); *see also Patriarca*, 295 F. Supp. 3d at 196 (stating that "[t]he 2010 amendment generally conformed the statutory language to the majority judicial interpretation of the pre-amendment language" and concluding that the "general case law" pertaining to whether an allegation was based on a public disclosure "would still be applicable . . . regardless of if it was decided before or after" the 2010 amendment (citations omitted)).

fraud" and "it is sufficient for the public disclosure bar that the disclosed transaction 'creates an inference of impropriety'" (quoting *United States ex rel. Burns v. A.D. Roe Co.*, 186 F.3d 717, 724 (6th Cir. 1999))); *United States ex rel. Monaghan v. N.Y.C. Dep't of Hous., Pres., & Dev.*, No. 09-CV-6547 (BSJ), 2012 WL 4017338, at *5–6 (S.D.N.Y. Sep. 10, 2012) (holding that the public disclosure bar applied because the claims were "clearly based upon transactions which were fully disclosed over the course of" a prior state court action, even though the earlier disclosures did not include the specific allegation of fraud (citing *Kirk III*, 437 F. App'x at 17)), *aff'd sub nom. Monaghan v. Henry Phipps Plaza W., Inc.*, 531 F. App'x 127 (2d Cir. 2013); *Ping Chen ex rel. United States v. EMSL Analytical, Inc.*, 966 F. Supp. 2d 282, 298–99 (S.D.N.Y. 2013) (holding that the public disclosure bar applies if "the relevant disclosures exposed 'all the essential elements of the fraud' alleged and made public the 'crux of the alleged fraud'" (quoting *Monaghan*, 2012 WL 4017338, at *5)); *United States ex rel. Kester v. Novartis Pharm. Corp.*, 43 F. Supp. 3d 332, 347 (S.D.N.Y. 2014) (holding that the "standard for determining whether a relator's allegations are 'substantially similar' to prior public disclosures is whether the disclosures in question exposed 'all the *essential elements* of the alleged fraud'" (quoting *Kirk III*, 437 F. App'x at 17)); *Grabcheski v. Am. Int'l Grp., Inc.*, 687 F. App'x 84, 86 (2d Cir. 2017) (summary order) (holding that the public disclosure bar did not apply because the public disclosures cited "did not disclose the essential elements of the claim" (citing *Kirk I*, 601 F.3d at 103)); *United States ex rel. Patriarca v. Siemens Healthcare Diagnostics, Inc.*, 295 F. Supp. 3d 186, 196–97 (E.D.N.Y. 2018) (holding that "[t]he bar is triggered if 'material elements' of the fraud have been publicly disclosed, and does not require that the alleged fraud, itself, have been disclosed" (collecting cases)); *Fed. Deposit Ins. Corp. v. Fifth Third Bank, N.A.*, 651 F. Supp. 3d 722, 728 (S.D.N.Y. 2023) (same).

Several courts in this Circuit have relied on a formulation set forth by the D.C. Circuit to further illustrate the point:

> [I]f X + Y = Z, Z represents the *allegation* of fraud and X and Y represent its essential elements. In order to disclose the fraudulent *transaction* publicly, the combination of X and Y must be revealed, from which readers or listeners may infer Z, *i.e.*, the conclusion that fraud has been committed. The language employed in § 3730(e)(4)(A) suggests that Congress sought to prohibit *qui tam* actions *only* when either the allegation of fraud or the critical elements of the fraudulent transaction themselves were in the public domain.

*United States ex rel. Springfield Terminal Ry. Co. v. Quinn*, 14 F.3d 645, 654 (D.C. Cir. 1994); *see also United States ex rel. Lissack v. Sakura Glob. Cap. Mkts., Inc.*, No. 95-CV-1365 (BSJ), 2003 WL 21998968, at *10–11 (S.D.N.Y. Aug. 21, 2003) (employing *Springfield* formula and observing that "[t]his equation has been used by numerous courts in different circuits, including courts in this circuit" (collecting cases)), *aff'd*, 377 F.3d 145 (2d Cir. 2004).

Here, Relator's allegations of fraud fall into three categories. She alleges that Defendants falsely certified (1) the size of their businesses in their PPP loan applications (the "business-size fraud" claim), (2) their need for the loans in their loan applications (the "loan necessity fraud" claim), and (3) the portion of the loans they used on eligible expenses in their loan forgiveness applications (the "loan forgiveness fraud" claim). (*See* Opp'n, Dkt. 51, at 2 (citing Am. Compl., Dkt. 43, ¶¶ 22, 29, 39–41, 43–45, 63–65, 72–76, 98, 117, 127, 130–31, 151–52); *id.* at 8 (grouping allegations into these "three distinct frauds").) As described below, the business-size fraud claim was previously publicly disclosed, but the other two claims were not.

1. <u>Business-Size Fraud Claim</u>

First, Relator asserts that Defendants falsely certified that they had no more than 500 employees, the size limit for nonprofits to be eligible for PPP loans. (*See* Am. Compl., Dkt. 43, ¶¶ 18–30, 37–38, 89, 94–116.) Relator argues that FEGS, Home Health, and Home Attendant were each individually ineligible due to their size, and also that they were ineligible because they

are affiliates and thus their employee headcounts should have been combined in determining their eligibility for a PPP loan. (*See id.* ¶¶ 22, 98, 109, 115–16.) Defendants argue that the information regarding Defendants' size and affiliation status was publicly disclosed through, *inter alia*, Defendants' public "Form 990" annual tax returns ("Form 990s"), state agency responses to Relator's requests under New York's Freedom of Information Law ("NY FOIL"), and the SBA's publicly-released data on PPP loan recipients. (*See* Mem., Dkt. 49-1, at 7 (citing Am. Compl., Dkt. 43, ¶¶ 23–28, 30, 41, 74, 76, 139, 147).)[11]

Relator does not dispute that these types of documents constitute public disclosures within the meaning of the FCA. (*See generally* Opp'n, Dkt. 51, at 7–11.) Nonetheless, the Court holds that NY FOIL responses do not qualify as public disclosures in light of the 2010 amendment to the FCA. The amended public disclosure bar provides, as relevant here, that the information must have been disclosed "in a congressional, Government Accountability Office, or other *Federal* report, hearing, audit, or investigation." 31 U.S.C. § 3730(e)(4)(A)(ii) (emphasis added). While a state agency's NY FOIL responses are likely "reports" within the meaning of the FCA, they plainly are not *federal* reports. *See Kirk II*, 563 U.S. at 407–16 (holding that a federal agency's Freedom of Information Act ("FOIA") responses are "reports" based on the ordinary meaning of the term "report"); *United States ex rel. Anti-Discrimination Ctr. v. Westchester County*, 495 F. Supp. 2d 375, 380–83 (S.D.N.Y. 2007) (concluding that the public disclosure bar applies only to *federal* government reports—even before the explicit "federal" qualifier was added in the 2010 amendment—and therefore holding that the bar does not apply to

[11] The Court can consider the contents of these documents because they are incorporated by reference in the Amended Complaint. *See DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010) ("In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." (citations omitted)).

information obtained through an NY FOIL request to a state agency). Therefore, the Court will not consider the information contained in the NY FOIL responses when considering what information had been "publicly disclosed."

With respect to the remaining documents—the Form 990s and the SBA loan data—Relator argues that the information contained therein is not "substantially the same" as her allegations because those documents do not "suggest any inference of impropriety" or "put the government on the trail of any fraud by the Defendants." (Opp'n, Dkt. 51, at 11.) The Court disagrees and finds that these documents are "substantially the same" because they contain all of the essential elements of Relator's business-size fraud claim.

As noted above, Defendants certified to the SBA that they each had the maximum number of 500 employees when they applied for their PPP loans. (*See* Am. Compl., Dkt. 43, ¶ 30 ("Loan data released by the SBA to the public . . . reflected a report of . . . 500 employees for each Defendant.").) Assuming that those certifications were true, Defendants would exceed the maximum number of employees if they were "affiliates," which would require them to combine their employee headcounts. *See* 15 U.S.C. § 636(a)(36)(D)(i), (v)–(vi). The then-applicable SBA regulations[12] provided that entities were affiliates if "one controls or has the power to control the other, or a third party or parties controls or has the power to control both," including situations where the "officers, managing members, or partners who control the management" of one entity "also control[] the management of one or more other" entities, or if

[12] The CARES Act states that nonprofits that apply for PPP loans are subject to the affiliation provisions set forth in 13 C.F.R. § 121.103. *See* 15 U.S.C. § 636(a)(36)(D)(vi). That regulation, in turn, states that applicants in the SBA's Business Loan program, which includes the PPP loan program, are subject to the affiliation provisions set forth in 13 C.F.R. § 121.301. *See* 13 C.F.R. § 121.103(a)(8); *see also* Business Loan Program Temporary Changes; Paycheck Protection Program, 85 Fed. Reg. 20,817-01, 20,819 (Apr. 15, 2020) (to be codified at 13 C.F.R. pt. 121) (explaining that PPP borrowers are subject to the affiliation rules contained in 13 C.F.R. § 121.301).

"a single individual . . . or entity that controls the Board of Directors or management of one" entity "also controls the Board of Directors or management of one [or] more other" entities. 13 C.F.R. § 121.301(f)(3) (Mar. 27, 2020). And Defendants' Form 990s for 2019 showed that FEGS, Home Health, and Home Attendant were controlled by the same four directors: Moshe Silberstein (Chairman), Israel Landau (Director), Jon Karger (Secretary), and Martin Walter (Director).[13] Combining this public information shows that Defendants were affiliates and that their combined headcount was 1,500 employees, making them ineligible for PPP loans based on size.

Accordingly, since all of the essential elements of Relator's business-size fraud claim were publicly disclosed, the claim is barred unless Relator is an "original source" of the information, which, as discussed *infra*, the Court finds she is.

2. Loan Necessity Fraud Claim

Second, Relator asserts that Defendants falsely certified that they needed PPP loan funds to support their ongoing operations. (*See* Am. Compl., Dkt. 43, ¶¶ 40, 63–65, 72–74, 117, 130–31); *see also* 15 U.S.C. § 636(a)(36)(G)(i)(I) (requiring PPP loan borrowers to "make a good faith certification . . . that the uncertainty of current economic conditions makes necessary the loan request to support the ongoing operations of the eligible recipient").

---

[13] *See* FEGS Home Attendant Services Inc., *Return of Organization Exempt from Income Tax (Form 990)* 7 (2019), *available at* https://projects.propublica.org/nonprofits/organizations/133161675/202131349349304903/full [https://perma.cc/F67D-5R3Y] (last visited Aug. 25, 2026); Home Attendant Service of Hyde Park Inc, *Return of Organization Exempt from Income Tax (Form 990)* 7 (2019), *available at* https://projects.propublica.org/nonprofits/organizations/112522076/202121349349304667/full [https://perma.cc/M8QK-2RXT] (last visited Aug. 25, 2026); Home Health Management Services, *Return of Organization Exempt from Income Tax (Form 990)* 7 (2019), *available at* https://projects.propublica.org/nonprofits/organizations/133020559/202131349349304758/full [https://perma.cc/LP7X-LBJH] (last visited Aug. 25, 2026). Defendant FEGS reported one additional director, Ervin Pismichenko. *See* FEGS Home Attendant Services Inc., *Return of Organization Exempt from Income Tax (Form 990)*, *supra*, at 7.

Defendants argue, in effect, that this claim is barred because Relator relies on public information to support her assertion that Defendants did not need the PPP loan funds. Specifically, Defendants point to the Amended Complaint's allegations about (1) Defendants' combined net assets and available cash accounts; (2) Defendants' receipt of other stimulus funding during the pandemic; (3) Defendants' business model, which is that most of their employees provide direct care services that are reimbursed by Medicaid, and that Defendants do not otherwise need to pay them; and (4) Kaff and Kornitzer, Defendants' controlling members, acquiring new properties worth several millions of dollars during the COVID-19 pandemic. (*See* Mem., Dkt. 49-1, at 7–9; Reply, Dkt. 50, at 5–6; *see also* Am. Compl., Dkt. 43, ¶¶ 39–41, 72.)[14]

But this evidence is not "substantially the same" as Relator's allegation that Defendants did not need the PPP loan funds to support their ongoing operations in April 2020. None of these alleged public disclosures, in isolation or in combination, disclose the essential element of this fraud allegation: whether Defendants *needed* the PPP loans because of the uncertain economic conditions at the time and the costs of Defendants' ongoing operations. It is entirely possible that despite Defendants having millions of dollars in assets and/or cash accounts, receiving other stimulus funds, and not having to pay their employees beyond the Medicaid reimbursements Defendants received, and despite Kaff and Kornitzer acquiring new properties, Defendants *still* needed PPP funds to support their ongoing operations in April 2020. Put differently, while the public disclosures contain information about Defendants' funding and assets, they do not establish how much money Defendants needed to operate, or how the uncertain economic conditions in April 2020 affected their operating costs. For this reason, these

[14] The Court assumes *arguendo* that all of this information was publicly disclosed within the meaning of the FCA because Relator does not dispute the issue, (*see generally* Opp'n, Dkt. 51, at 11–12), and because it does not affect the outcome with respect to Relator's loan necessity fraud claim.

public disclosures are not substantially the same as Relator's loan necessity fraud claim, and the public disclosure bar does not apply.

3. Loan Forgiveness Fraud Claim

Third, Relator asserts that Defendants submitted fraudulent applications for loan forgiveness by falsely certifying that they used the funds for eligible expenses, including by certifying that they used at least 60% of the funds for eligible payroll expenses. (Am. Compl., Dkt. 43, ¶¶ 43–44, 75, 83, 91, 132–52.) She alleges, *inter alia*, that Defendants certified that they used the PPP loan funds to cover payroll expenses for their direct care workers, but that those payroll expenses were ineligible because they were already covered by Medicaid. (*See id.* ¶ 151; Opp'n, Dkt. 51, at 8.) She also argues that the Wage Parity Law prohibited Defendants from receiving returned funds that were spent to satisfy state law's minimum compensation requirements for home care workers, and that by receiving PPP loan forgiveness for direct care workers' payroll expenses, Defendants did exactly that, thereby also making the expenses ineligible. (*See* Am. Compl., Dkt. 43, ¶¶ 150–51.) Defendants argue that this claim relies on the Wage Parity Law, which is, "by definition, a public disclosure," and that "[t]he application of this law to Medicaid and [licensed home care service agencies] is likewise published and readily accessible on government-maintained websites." (Reply, Dkt. 50, at 4 (citations omitted).)

However, the fact that some of Defendants' employees' wages were reimbursable through Medicaid and subject to the requirements of the Wage Parity Law is not "substantially the same" as Relator's loan forgiveness fraud claim. While the alleged public information might establish that some of Defendants' employees (direct care workers) had payroll expenses that were ineligible for PPP loan forgiveness, it does not rule out the possibility that Defendants had *other* employees whose payroll expenses were (1) eligible and (2) large enough that 60% of Defendants' PPP loan funds could have been used to cover them. Relator effectively rules out

that possibility based on her inside knowledge and direct observation. (*See* Am. Compl., Dkt. 43, ¶ 71 (Relator asserting that she learned that Defendants had obtained PPP loans through her work with Kaff and Kornitzer, and that these loans were "very sizable" and "appeared to be based on all of the Defendants' employees" rather than just their eligible administrative staff); *id.* ¶ 73 (Relator asserting that "FEGS had well over 1000 employees, [but] it only maintained an administrative staff of approximately 20"); *id.* ¶ 75 (Relator drawing the inference that "to obtain full loan forgiveness, Defendants must have included ineligible wages on their loan forgiveness applications and falsely certified that such wages were eligible for loan forgiveness").)[15] Accordingly, because the existence of the Wage Parity Law and its applicability to Medicaid and licensed home care service agencies is not substantially the same as Relator's loan forgiveness claim, the public disclosure bar does not apply to that claim.

### B. Whether Relator Qualifies as an Original Source

Even though Relator's business-size fraud claim is substantially the same as prior public disclosures, this claim may nonetheless survive the public disclosure bar if Relator qualifies as an "original source" of the information. *See* 31 U.S.C. § 3730(e)(4)(A)–(B). The FCA defines an original source as an individual who either "voluntarily disclosed to the Government the information on which allegations or transactions in a claim are based" prior to the public disclosure that would otherwise bar the claim, or who "has knowledge that is independent of and

[15] The Amended Complaint states that the New York State Department of Health's responses to Relator's NY FOIL requests show that Defendants Home Attendant and Home Health reported 2,824 "total private pay hours" in 2019, but that the rest of their operations "consisted of Medicaid Managed Care patients in the Wage Parity counties." (Am. Compl., Dkt. 43, ¶ 147.) Defendants assert that this information triggers the public disclosure bar. (*See* Mem., Dkt. 49-1, at 3, 7 (citing, *inter alia*, Am. Compl., Dkt. 43, ¶ 147).) But even assuming *arguendo* that state NY FOIL responses qualify as public disclosures, this information still does not rule out the possibility that Defendants could have had a sufficient amount of eligible payroll expenses to have qualified them for full PPP loan forgiveness.

materially adds to the publicly disclosed allegations or transactions, and who has voluntarily provided the information to the Government before filing an action" under the FCA. *Id.* § 3730(e)(4)(B).[16] Relator argues that she falls into the second category. (*See* Opp'n, Dkt. 51, at 13 (arguing that Relator has independent knowledge of the information that "adds 'new value to information already in the public domain'" (quoting *United States v. U.S. Oncology, Inc.*, No. 19-CV-5125 (NG) (LB), 2022 WL 17685383, at *11 (E.D.N.Y. July 21. 2022), *aff'd sub nom. Omni Healthcare Inc. v. U.S. Oncology, Inc.*, No. 23-1334-CV, 2024 WL 4751635 (2d Cir. Nov. 12, 2024)).) Defendants argue that Relator does not fit the definition because her allegations do not "materially add" to the publicly disclosed information. (*See* Mem., Dkt. 49-1, at 10–11.)[17]

Despite introducing the "materially adds" language to the FCA with the 2010 amendment, Congress did not define it. *See generally* 31 U.S.C. § 3730(e)(4)(B); *see also Omni*

---

[16] Before the 2010 amendment, the FCA required that the relator have "direct and independent knowledge of the information on which the allegations are based and ha[ve] voluntarily provided the information to the Government before filing an action under this section which is based on the information." 31 U.S.C. § 3730(e)(4)(B) (2009) (amended 2010).

[17] Defendants do not dispute that Relator has adequately pleaded that she voluntarily provided the information to the government before filing this action, as required by 31 U.S.C. § 3730(e)(4)(B). (*See generally* Mem., Dkt. 49-1, at 7–11.) As a result, any argument about that requirement has been forfeited. *See Coal. for Competitive Elec., Dynegy Inc. v. Zibelman*, 272 F. Supp. 3d 554, 581 n.28 (S.D.N.Y. 2017) ("Failure to adequately brief an argument constitutes waiver of that argument at the motion to dismiss stage." (citation modified) (quoting *Guzman v. Macy's Retail Holdings, Inc.*, No. 09-CV-4472 (PGG), 2010 WL 1222044, at *8 (S.D.N.Y. Mar. 29, 2010))), *aff'd*, 906 F.3d 41 (2d Cir. 2018). Defendants also do not present any developed argument that Relator lacks independent knowledge. (*See* Mem., Dkt. 49-1, at 1–2 (arguing in the preliminary statement that Relator has no "independent," "personal," or "first-hand knowledge of any false claim"); *but see id.* at 9–12 (arguing in the section on original source status only that Relator's claims do not "materially add" to the publicly disclosed information).) The Court also deems this argument forfeited and therefore assumes that Relator has independent knowledge of her allegations. (*See also* Am. Compl., Dkt. 43, ¶¶ 33, 67–76 (describing how Relator's knowledge was obtained directly through her work with Defendant FEGS and controlling members Kaff and Kornitzer).)

*Healthcare*, 2024 WL 4751635, at *3 (noting that "[t]he pre- and post-amendment definitions of an 'original source' are distinct"). To the Court's knowledge, there is no binding precedent from the Second Circuit interpreting this term, and a split has emerged among the other circuits that have addressed the issue. A minority of circuits have held that information cannot "materially add" to the public disclosures if the public disclosures "were already sufficient to give rise to an inference" of fraud. *United States ex rel. Osheroff v. Humana Inc.*, 776 F.3d 805, 815 (11th Cir. 2015) (citation omitted); *see also United States ex rel. Kraxberger v. Kan. City Power & Light Co.*, 756 F.3d 1075, 1080 (8th Cir. 2014) (concluding that where the relator's information was "essentially" the publicly disclosed information, the relator "does not materially add to what was publicly disclosed"); *Cause of Action v. Chi. Transit Auth.*, 815 F.3d 267, 283 (7th Cir. 2016) (similar). Under this reasoning, Relator would not be an original source of the business-size fraud claim because the essential elements of the claim were already in the public domain, so there would be no way for her to materially add to them.

But, as the majority of other circuits have recognized, this standard "has the effect of collapsing the materially-adds inquiry into the substantially-the-same inquiry." *United States ex rel. Reed v. KeyPoint Gov't Sols.*, 923 F.3d 729, 757 (10th Cir. 2019); *accord United States ex rel. Moore & Co. v. Majestic Blue Fisheries, LLC*, 812 F.3d 294, 306 (3d Cir. 2016); *United States ex rel. Winkelman v. CVS Caremark Corp.*, 827 F.3d 201, 211–12 (1st Cir. 2016); *United States ex rel. O'Connor v. U.S. Cellular Corp.*, 153 F.4th 1272, 1280–81 (D.C. Cir. 2025); *see also United States ex rel. Maur v. Hage-Korban*, 981 F.3d 516, 527 (6th Cir. 2020) (citing, *inter alia*, *Reed*, 923 F.3d at 756, 759, without distinguishing other circuits' approaches). Indeed, the public disclosure bar only applies in the first place if the public disclosures were sufficient to give rise to an inference of fraud. The existence of an exception to that bar therefore clearly

contemplates that even when that is the case, there nonetheless could be information that adds "materially" to those public disclosures. *See Reed*, 923 F.3d at 757. "In other words, even if a complaint alleges a fraud 'substantially the same' as one previously disclosed, the allegations might still 'materially add' to the publicly available information." *O'Connor*, 153 F.3d at 1281. "After all, what good is an exception (i.e., the original source exception) that does not actually except anything?" *Reed*, 923 F.3d at 757 (citing Joel D. Hesch, *Restating the "Original Source Exception" to the False Claims Act's "Public Disclosure Bar" in Light of the 2010 Amendments*, 51 U. Rich. L. Rev. 991, 1016 (2017)).

"The salient issue, then," under the majority view, "is how to distinguish additional but immaterial information from information that 'materially adds' to the publicly disclosed allegation or transaction of fraud." *Moore*, 812 F.3d at 306. In *Winkelman*, the First Circuit stated that additional information is material "if it is '[o]f such a nature that knowledge of the item would affect a person's decision-making,' or if it is 'significant,' or if it is 'essential.'" 827 F.3d at 211 (alteration in original) (quoting *Material*, *Black's Law Dictionary* (10th ed. 2014)). The First Circuit explained that "[t]his dictionary definition comports with the common law understanding of 'material,' which focuses the relevant inquiry on whether a piece of information is sufficiently important to influence the behavior of the recipient." *Id.* (citation omitted). Put succinctly, in the FCA context, "a 'material addition' is information that is 'sufficiently significant or essential' to influence the government's decision to prosecute." *United States ex rel. Winnon v. Lozano*, 146 F.4th 1197, 1211 (D.C. Cir. 2025) (citing *United States ex rel. O'Connor v. USCC Wireless Inv., Inc.*, 128 F.4th 276, 288–89 (D.C. Cir. 2025), *cert. denied*, 146 S. Ct. 1447 (2026)); *cf. Univ. Health Servs., Inc. v. United States*, 579 U.S. 176, 193 (2016) ("Under any understanding of the concept, materiality 'look[s] to the effect on the

likely or actual behavior of the recipient of the alleged misrepresentation.'" (alteration original) (quoting 26 Richard A. Lord, *Williston on Contracts* § 69:12 (4th ed. 2003))).

Absent further guidance from the Second Circuit, the Court adopts the majority's reasoning, which the Court finds more persuasive than the minority position.[18] Thus, the fact that the essential elements of Relator's business-size fraud claim were in the public domain does not preclude the possibility that she may have materially added to the information. And, applying the majority standard, the Court concludes that Relator qualifies as an "original source" of the business-size fraud claim. The public disclosures at issue—Defendants' Form 990s and the SBA loan data—might contain the essential elements of the claim, but Relator materially added to those disclosures by using her personal observations and experiences with Defendants and their operations to connect the dots between those otherwise-unconnected pieces of public information. Relator also contributed information about Kaff and Kornitzer's effective control over all three Defendants, information that is not in the public domain. (*See, e.g.*, Am. Compl., Dkt. 43, ¶ 67 (explaining that Relator's work for FEGS, and Kaff and Kornitzer as well, allowed her to observe that "FEGS, Home Health, and Home Attendant were all effectively run as one operation" by Kaff and Kornitzer); *id.* ¶ 70 (adding that Kaff and Kornitzer "were the sole decision makers" for multiple of the Defendant entities and "did not appear to need Board approvals for their decision-making").) All of this information is material because it is

[18] The Second Circuit has cited cases from both sides of the circuit split in its summary orders. *Contrast Vierczhalek v. MedImmune, Inc.*, 803 F. App'x 522, 526 (2d Cir. 2020) (summary order) (citing *United States ex rel. Paulos v. Stryker Corp.*, 762 F.3d 688, 694–95 (8th Cir. 2014) (itself citing *Kraxberger*, 756 F.3d at 1080, for the conclusion that a relator's knowledge does not "materially add" if "essentially all of relator's knowledge relevant to his FCA claim appeared in existing public disclosures")), *with United States ex rel. CKD Project, LLC v. Fresenius Med. Care Holdings, Inc.*, No. 21-2117, 2022 WL 17818587, at *4 (2d Cir. Dec. 20, 2022) (summary order) (citing *Winkelman*, 827 F.3d at 213, for the definition of what does or does not constitute a material addition).

"'sufficiently significant or essential' to influence the government's decision [whether or not] to prosecute." *Lozano*, 146 F.4th at 1211.[19]

In fact, Relator's efforts with respect to all three of her claims could reasonably be expected to influence the government's decision to prosecute, because without her investigation, it appears that the alleged frauds would not be on the government's radar at all. Relator's claims did not "derive from a third party's research and investigation"; she herself "discovered the alleged fraud" and "conducted the investigation." *See Kennard v. Comstock Res.*, 363 F.3d 1039, 1046 (10th Cir. 2004); *see also Ping Chen*, 966 F. Supp. 2d at 299 (distinguishing between individuals who "simply stumble upon a seemingly lucrative nugget and those actually involved in the process of unearthing important information about a false or fraudulent claim" (quoting *Stennett v. Premier Rehab, LLC*, 479 F. App'x 631, 635 (5th Cir. 2012)). Indeed, "[t]his case would not exist but for Relator[] sniffing it out." *Kennard*, 363 F.3d at 1046. Based on the above, the Court finds Relator's contributions to this case sufficient to make her an original source.

Relator's business relationship with Defendant FEGS, and the inside information she obtained about all three Defendants through that relationship, distinguish this case from others in which courts in this Circuit have denied original source status. For example, in *United States ex rel. JDJ & Associates v. Natixis*, No. 15-CV-5427 (PKC), 2017 WL 4357797 (S.D.N.Y. Sep. 29, 2017), the court pointed out that the relator never had "any business relationship with [the

[19] At the same time, the fact that the government chose not to intervene in this case, (*see* Notice of Election to Decline Intervention, Dkt. 12), does not undermine the materiality of Relator's allegations, because the Court must consider the *likely* effect of the information on its recipient. *See Univ. Health Servs.*, 579 U.S. at 193 (citation omitted). As the D.C. Circuit explained, "the government's discretionary decision not to intervene says very little about the materiality of the relator['s] new information," and the Court "should not draw an inference of immateriality based on a government decision declining intervention." *O'Connor*, 153 F.4th at 1282 n.3.

defendant] through which [the relator] gained insider information regarding [the defendant's] alleged fraudulent actions." *Id.* at *10. The court concluded that the relator was not an original source because they failed to "identify anything that aroused [the relator's alleged independent suspicions] other than information that was publicly available." *Id.* at *11. That is quite different from the instant case, where Relator's suspicions of fraud began independently through her business relationship with Defendant FEGS, and she only later corroborated those suspicions with publicly available data and a state NY FOIL request. *See also United States ex rel. CKD Project, LLC v. Fresenius Med. Care Holdings, Inc.*, 551 F. Supp. 3d 27, 33 (E.D.N.Y. 2021) (denying original source status because the relator was "not a whistleblower, but an entity formed solely for this litigation" that "acquired its information from a third party" and offered "little information on the source of its knowledge"), *aff'd*, No. 21-2117, 2022 WL 17818587 (2d Cir. Dec. 20, 2022); *United States ex rel. Vierczhalek v. MedImmune, Inc.*, 345 F. Supp. 3d 456, 464–65 (S.D.N.Y. 2018) (denying original source status where relator filed a complaint, the State of New York filed a complaint-in-intervention alleging a different theory of liability, and relator filed an amended complaint to mirror the state's theory; and holding that the relator did not "plausibly allege that the information she provided in the original complaint is the information on which her amended complaint [was] based" (citation modified)), *aff'd*, 803 F. App'x 522 (2d Cir. 2020).

Rather, this case more closely resembles *United States ex. rel. Associates Against Outlier Fraud v. Huron Consulting Group, Inc.*, 843 F. Supp. 2d 464 (S.D.N.Y. 2012), *aff'd*, 567 F. App'x 44 (2d Cir. 2014), where the court held (under the pre-amendment statute[20]) that a relator

[20] As noted *supra*, the pre-amendment version of the original source exception required the relator to have "direct and independent knowledge of the information on which the allegations are based," 31 U.S.C. § 3730(e)(4)(B) (2009) (amended 2010), whereas the post-

who obtained knowledge as an independent contractor working for the defendant, and who later submitted FOIA requests that led to responses forming the basis for the relator's lawsuit, qualified as an original source. *See id.* at 470.

*        *        *

In sum, Relator's loan necessity fraud and loan forgiveness fraud claims are not substantially the same as the prior public disclosures, and all three of her claims fall within the original source exception. Defendants' motion to dismiss based on the FCA's public disclosure bar is therefore denied.

## II. Rule 9(b)'s Particularity Requirement

In the alternative, Defendants argue that the Amended Complaint should be dismissed for failure to comply with Rule 9(b)'s requirement that fraud claims be pled with particularity. (Mem., Dkt. 49-1, at 12–13.) Relator agrees that the heightened pleading requirement of Rule 9(b) applies to claims brought under the FCA, such as hers. (Opp'n, Dkt. 51, at 3); *accord United States ex rel. Polansky v. Pfizer, Inc.*, 822 F.3d 613, 617–18 (2d Cir. 2016) ("The FCA is an anti-fraud statute; accordingly, [the relator] must plead fraud with particularity pursuant to Federal Rule of Civil Procedure 9(b)." (citation omitted)).

"To satisfy Rule 9(b), a complaint alleging fraud 'ordinarily' must '(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.'" *United States ex rel. Miller*, 110 F.4th 533, 543–44 (2d Cir. 2024) (quoting *Chorches*, 865 F.3d at 81). Rule 9(b) "imposes a 'rigid requirement' of particularity that can only yield, permitting a *qui tam* plaintiff to make allegations based on information and belief, when those facts are

---

amendment version requires the relator to have "knowledge that is independent of and materially adds to the publicly disclosed allegations or transactions," 31 U.S.C. § 3730(e)(4)(B).

'peculiarly within' the defendant's knowledge." *Id.* at 544 (first quoting *Wexner v. First Manhattan Co.*, 902 F.2d 169, 172 (2d Cir. 1990); and then citing *Chorches*, 865 F.3d at 86). Still, under Rule 9(b), "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally," Fed. R. Civ. P. 9(b), which aligns with the FCA's "liberal scienter requirement," *Gold*, 68 F.3d at 1477; *accord* 31 U.S.C. § 3729(b)(1) ("[T]he terms 'knowing' and 'knowingly' . . . require no proof of specific intent to defraud[.]"). In general, "the adequacy of particularized allegations under Rule 9(b) is case- and context-specific." *Chorches*, 865 U.S. at 81 (citation modified) (quoting *Espinoza ex rel. JPMorgan Chase & Co. v. Dimon*, 797 F.3d 229, 236 (2d Cir. 2015)).

Here, Defendants claim that Relator has "fail[ed] to satisfy [Rule 9(b)'s] requirements by providing no specific details regarding Defendants' alleged false certifications whatsoever." (Mem., Dkt. 49-1, at 12; *see also id.* at 13 (arguing that Relator's "bare allegations lack the particularity necessary to satisfy Rule 9(b) because they fail to allege 'specific facts . . . such as who signed the claims, when such claims were submitted, where such claims were submitted, and the content of the claims'" (quoting *United States ex rel. Piacentile v. Amgen, Inc.*, No. 04-CV-3983 (SJ) (RML), 2021 WL 5631958, at *12 (E.D.N.Y. 2021), *aff'd sub nom. Piacentile v. U.S. Oncology, Inc.*, No. 22-18, 2023 WL 2661579 (2d Cir. Mar. 28, 2023))).) "Rather," they contend, "Relator simply concludes that false certifications must have been made—by someone at some unknown time and date—because Defendants[] received PPP loans and reported an excess of 500 employees on tax returns." (*Id.* at 12–13 (citing Am. Compl., Dkt. 43, ¶¶ 14–25).) Relator responds that she "has alleged the specific dates on which each Defendant obtained its PPP loan" and received loan forgiveness, as well as the amounts of the loans and loan forgiveness; identified "the controlling individuals responsible for the false certifications," Kaff

and Kornitzer; and detailed the "specific false certifications made by the Defendants to the government." (Opp'n, Dkt. 51, at 14–15 (citing Am. Compl., Dkt. 43, ¶¶ 15–17, 33, 42–48, 61, 67–71, 75, 89, 91, 117–52).) Thus, she claims, "[s]he has certainly alleged the who, what, when, where, and how of the alleged fraud." (*Id.* at 14.)

The Court finds that Relator has satisfied Rule 9(b)'s pleading requirements. She has adequately specified the statements that she contends were fraudulent, (*see* Am. Compl., Dkt. 43, ¶¶ 89, 91); identified the "speakers," i.e., Defendants through Kaff and Kornitzer, (*see id.* ¶¶ 15–17, 33, 67, 70); and has explained the factual bases for why the statements were fraudulent, (*see, e.g.*, *id.* ¶¶ 21–28 (allegations regarding Defendants' actual size); *id.* ¶¶ 31–37 (allegations regarding Defendants' affiliation); *id.* ¶¶ 39–41 (allegations regarding Defendants' lack of need for the loans); *id.* ¶¶ 43–44 (allegations regarding Defendants' ineligibility for forgiveness)). While Relator does not state specifically when Defendants submitted their applications or who signed them, those facts are "peculiarly within [Defendants'] knowledge," and can therefore be alleged based on information and belief. *Chorches*, 865 F.3d at 81–82 (quoting *Wexner*, 902 F.2d at 172). And there is no question that Relator's allegations strongly support the inference that Defendants did, in fact, submit the PPP loan and forgiveness applications at issue—indeed, Defendants could not have received the loans or forgiveness without applying for them—and that Defendants succeeded because of fraud. *See id.* at 81–93 (holding that the relator adequately pled that fraudulent claims were submitted to Medicare, despite the relator's failure to identify "actual invoices that were submitted to the federal government"). Defendants' motion to dismiss based on Rule 9(b) is therefore also denied.

## CONCLUSION

For the reasons stated above, Defendants' motion to dismiss, (Dkt. 49), is denied in its entirety.

SO ORDERED.

*/s/ Pamela K. Chen*
Pamela K. Chen
United States District Judge

Dated: August 25, 2026
Brooklyn, New York